[No. C003383. Third Dist. Mar. 29, 1990.]

BOARD OF SUPERVISORS OF BUTTE COUNTY, Plaintiff and Respondent, v.
LINDA McMAHON, as Director, etc., et al., Defendants and Appellants;
STEPHANIE ROWE et al., Interveners and Respondents.

**COUNSEL**

John K. Van de Kamp, Attorney General, Charlton G. Hollard III, Assistant Attorney General, Elisabeth C. Brandt and Dennis Eckhart, Deputy Attorneys General, for Defendants and Appellants.

Livingston & Mattesich, Gene Livingston, Melissa M. Meith, Ephraim Margolin, Nicholas C. Arguimbau and Susan Roff for Plaintiff and Respondent.

Max Robinson, County Counsel (Fresno), Pamela A. Stone, Deputy County Counsel, De Witt W. Clinton, County Counsel (Los Angeles), Lawrence B. Launer, Assistant County Counsel, Martha E. Romero, Deputy County Counsel, Lloyd M. Harmon, Jr., County Counsel (San Diego), Terence G. Dutton, Deputy County Counsel, Nancy N. McDonough, Carl G. Borden and Douglas J. Maloney as Amici Curiae on behalf of Plaintiff and Respondent.

Alan Lieberman, Lucy Quacinella, Mark Greenberg and Richard A. Rothschild for Intervener and Respondent.

OPINION

DAVIS, J.—Linda McMahon, as Director of the Department of Social Services, Gray Davis, as Controller of the State of California, and the State of California (collectively, the State), appeal from a preliminary injunction granted the Board of Supervisors of Butte County (the County). The parties' dispute involves the State's power to require the County to contribute local funds to a state-mandated program. The trial court determined that two constitutional provisions gave the County a reasonable probability of prevailing on its claim for state funding. The court also found that the balance of hardships favored the County. Accordingly, the court's preliminary injunction ordered the State to fund the entire nonfederal share of the aid to families with dependent children (AFDC) grants-in-aid program in Butte County.

We shall conclude that the trial court erred by finding that the County would probably prevail on its claim. Neither the two constitutional theories considered *post*, nor the "home rule" and "impossibility" theories tendered here, support a preliminary injunction. Accordingly, we shall reverse.

BACKGROUND

California has elected to participate in the AFDC program, a federal program funded here 50 percent by the federal government and 50 percent by the state.[1] (Welf. & Inst. Code, § 11200, et seq.; 42 U.S.C. § 601 et seq.; *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 738-739 [97 Cal.Rptr. 385, 488 P.2d 953].) Counties pay 5.4 percent of the total cost of AFDC grants in aid made to their eligible residents.[2]

---

[1] Under Welfare and Institutions Code section 11207, "Every county shall grant aid to any child eligible therefor, in any amount needed, not to exceed the amount specified in Section 11450, and shall administer this chapter in such a manner as to achieve the greatest possible reduction of dependency and to promote the rehabilitation of recipients. . . ." (Further citations to sections of an undesignated code refer to the Welfare and Institutions Code.) Section 11450 provides "(a) For each needy family . . . qualified for aid under this chapter, there shall be paid . . . an amount of aid each month which when added to the family's income . . . is equal to the sums specified in the following table, as adjusted for cost-of-living increases pursuant to Section 11453 . . . [thereupon follows a table of maximum aid, depending upon the amount of eligible needy persons in the household]." Section 15200 provides "There is hereby appropriated out of any money in the State Treasury not otherwise appropriated, and after deducting available federal funds, the following sums: (a) To each county for the support and maintenance of needy children 89.2 percent of the sums specified in subdivision (a) . . . of Section 11450."

[2] State law formerly required each county to contribute 16.25 percent of the total cost of AFDC grants. (Former Welf. & Inst. Code, § 1510; Stats. 1957, ch. 2293, § 2, p. 3994.) In the wake of Proposition 13 (Cal. Const, art. XIII A), the Legislature amended section 15200 in 1979 and decreased that contribution to 5.4 percent. (Stats. 1979, ch. 282, § 78, p. 1043, eff. July 24, 1979.)

The Department of Social Services (the Department) administers the program in this state. (Welf. & Inst. Code, § 10600.) The Department establishes statewide standards for AFDC benefits administration, and its rules and regulations bind the counties, which act as the state's agents. (Welf. & Inst. Code, §§ 10604, 10800, 11209; *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 907 [141 Cal.Rptr. 133, 569 P.2d 727].)

On the November 1986 ballot, Butte County voters passed County Measure E, adding subsections (b) and (c) to article III of the Butte County charter. As adopted, Measure E provided that "(b) Except as hereinafter provided in subsection (c), the Board of Supervisors and all other County officials are prohibited from the use of any local funds in programs administered by the Butte County Department of Welfare. [¶] (c) The Board of Supervisors may provide local funds for the administration of services not to exceed the maximum amount of welfare funds utilized in fiscal year 1978-1979, as adopted in the County of Butte 1978-1979 budget." In fiscal year 1978-1979, the state picked up virtually 100 percent of the nonfederal share of Butte County's AFDC grants in aid program through post-Proposition 13 bailout legislation. (Stats. 1978, ch. 292, § 33; Stats. 1978, ch. 332, § 29.)

Measure E became effective on January 6, 1987, when the Secretary of State accepted and filed it. (See Gov. Code § 23723.) The County then adopted a resolution implementing Measure E as to AFDC grants in aid only.

On January 12, 1987, the Department both petitioned for a writ of mandate and sued for injunctive relief against the County. The Department contended that Measure E violated state law, and it sought to compel the County to continue to fund the Butte County AFDC program in the amounts state law required. On that same date, the County sued the State for declaratory and injunctive relief. The County asserted Measure E's validity and sought to compel the State to fund entirely the nonfederal portion of Butte County's AFDC grants. Stephanie Rowe, a Butte County AFDC recipient, and Harold Harrison, a Butte County general assistance recipient, intervened in each action. The interveners generally supported the State's position.

The court consolidated the actions for hearing. Butte County's chief administrative officer, Martin Nichols, testified about various County budgeting matters. Nichols's testimony touched on County revenue, state-mandated and local programs, and state AFDC funding. In essence, he testified that state-mandated programs were draining the County budget of funds to carry on local services effectively.

We summarize Nichols's testimony. According to him, property taxes form the single largest portion (42 percent) of the County's general purpose revenues. Prior to Proposition 13, the County had the lowest property tax rate in California. Since Proposition 13 locked the County into that low assessment base, the County now has the "lowest share of general purpose revenues and property taxes of any county in California." The County's per capita revenue is $139, half the $268 statewide average.

According to Nichols, between fiscal years 1979-1980 and 1985-1986, the proportion of general purpose revenues obligated to welfare costs rose from 7 percent to 15 percent. In that same period, the proportion of general purpose revenues obligated to all state-mandated programs increased from 45 percent to 65 percent. AFDC grant levels alone increased 73 percent, while the County's general purpose revenues increased only 31 percent, and the cost of living index increased only 50 percent. Between 1979 and 1986, the County's reserves fell from $2.75 million to $330,000.

According to Nichols, these increased welfare costs have forced the County to cut local services such as police and fire protection, road maintenance and libraries. For example, in 1987, Butte County had one sworn sheriff's officer per 1,500 residents, one-third the statewide average of one per 500. As a result, Nichols claimed, the County stands "[d]ead last. We have the worst level of protection in any county of California." Given the present trend in state-mandated welfare costs, Nichols projected that the County will run out of local money for local programs and services halfway through the 1992-1993 fiscal year. As of that time, he claimed, there will be "no police protection, no fire protection, no libraries, in Butte County."

The trial court voided Measure E as in conflict with state law on a matter of statewide concern. The court ultimately entered a judgment in the Department's action directing a writ of mandate to issue. That judgment commanded the County to comply with state law on the funding of all welfare programs irrespective of Measure E's provisions.

Although the parties' pleadings principally disputed Measure E's validity, the court saw its ruling not as the matter's end but "only the beginning." In its tentative decision, the court said: "To stop at this point leaves undecided the basic question whether the state can order counties to carry out state-mandated programs without paying for them; leaves untouched any reasonable relief as to the fiscal squeeze the counties find themselves in arising from ever-increasing imposition on the counties of state-mandated financial obligations at the same time as limitations are placed on the counties as to sources of money to pay the increased costs of government; and leaves the unfortunate souls who sorely need financial assistance twisting

slowly, slowly in the wind. [¶] This Court does not feel government need be that helpless; this Court does not feel government need be that callous. [¶] [T]he state asks for an order requiring the County to pay, the County asks for an order requiring the State to pay, and the welfare recipients ask for an order that somebody pay. [¶] We shall endeavor to find a lawful solution to the problem."

The court then considered the County's complaint outside of Measure E's context. It requested the parties to brief the constitutionality of the state's requirement that counties carry out state-mandated programs without complete state funding for such programs. On its own initiative, the court suggested that due process might bar such a requirement.

Following briefing and argument, the court issued a preliminary injunction ordering the State to fund entirely the Butte County AFDC program. The court first concluded the County would likely prevail on the merits on either of two legal theories: "a. The imposition of state mandated costs on Butte County, when the County's ability to increase its tax revenues is restricted by virtue of Proposition 13, violates the County's or the Board's right to due process of the law. [¶] b. [The] state is required by Article XVI, Section 11 [of the California Constitution] to finance fully state mandated welfare programs implemented through the county."

The court then found that the balance of hardships favored the County: "Without the protection of a preliminary injunction, the county will bear an ever increasing financial burden to pay for state mandated programs, including AFDC, from limited general purpose revenues. As a consequence, other claims on those funds will be diminished or eliminated with a loss to the citizens of the county of essential county services. [¶] A preliminary injunction which imposes on the State to pay the entire State's share of the AFDC grants for Butte County beneficiaries, from State funds, will cause a nominal increase in the State's budget for AFDC grants, but relieve the County of a large obligation which consumes a significant amount of its general purpose revenues. The State is better able to bear the burden and continue functioning during the pendency of this action than is the County."

The court stayed the injunction "until six months after either the time for appeal expires without the State appealing this order, or after a remittitur is issued by the Court of Appeal or the Supreme Court in this case. The purpose of the delayed effective date is to give the State a reasonable time to arrange for 100% payment of the State's share of the AFDC grants in aid for eligible recipients in Butte County."

This timely appeal followed.

## DISCUSSION

On appeal, we determine whether the trial court abused its discretion in granting the County the preliminary injunction. ■ " '[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]' [Citations.] ' "[By] balancing the respective equities of the parties, [the trial court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him." ' [Citation.]

■ "The granting or denying of a preliminary injunction does not constitute an adjudication of the ultimate rights in controversy. [Citations.] Generally, the ruling on an application for a preliminary injunction rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal absent a showing that it has been abused. [Citations.]" (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840] [fn. deleted].)

■ Where, as here, the preliminary injunction mandates an affirmative act that changes the status quo, we scrutinize it even more closely for abuse of discretion.[3] "The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts. A preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal." (6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 293, at p. 251.) As our Supreme Court noted many years ago, "[t]he granting of a mandatory injunction pending the trial, and before the rights of the parties in the subject matter which the injunction is designed to affect have been definitely ascertained by the chancellor, is not permitted except in extreme cases where the right thereto is clearly established and it appears that irreparable injury will flow from its refusal. [Citations.]" (*Hagen* v. *Beth* (1897) 118 Cal. 330, 331 [50 P. 425].) We must reverse the order

---

[3]The preliminary injunction before us ordered the State to "provide financing for the [AFDC] program." It thus mandated that the State pick up the financing burden otherwise assigned by law to the County. As such, it ordered affirmative acts that changed the status quo.

The court did stay the injunction pending this appeal. The stay here, however, does not change the preliminary injunction's mandatory nature. Rather, by its own terms, it merely gave the State time to arrange the ordered financing.

granting the injunction if we determine that either of the two interrelated factors do not support the trial court's order. (*American Academy of Pediatrics* v. *Van de Kamp* (1989) 214 Cal.App.3d 831, 837-838 [263 Cal.Rptr. 46].)

Under this abuse of discretion standard, we turn first to the trial court's initial conclusion that the County would likely prevail on the merits on either of two theories. First, the court suggested that the State violates due process of law when it makes counties pay for state-mandated programs while simultaneously limiting, under California Constitution article XIII A (Prop. 13), their revenue raising abilities. Alternatively, the court suggested that California Constitution article XVI, section 11, requires the state to fully fund state-mandated welfare programs that the counties implement.

## I. THE COUNTY HAS NO DUE PROCESS RIGHTS TO CHALLENGE THE STATE'S AFDC FUNDING STATUTES.

The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law; . . ." California Constitution article I, section 7, mirrors its federal counterpart: "(a) A person may not be deprived of life, liberty, or property without due process of law . . . ."

██ "It is well established that '[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment.' [Citations.]" (*City of South Lake Tahoe* v. *California Tahoe* (9th Cir. 1980) 625 F.2d 231, 233.) "[S]ubordinate political entities, as 'creatures' of the state, may not challenge state action as violating the entities' rights under the due process or equal protection clauses of the Fourteenth Amendment or under the contract clause of the federal Constitution. 'A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator. [Citations.]' [Citations.]" (*Star-Kist Foods, Inc.* v. *County of Los Angeles* (1986) 42 Cal.3d 1, 6 [227 Cal.Rptr. 391, 719 P.2d 987].)

*Star-Kist* noted that the rule's application beyond Fourteenth Amendment and contract clause challenges remains unsettled. (42 Cal.3d 1, 6.) From this, Butte County suggests the possibility of due process protection under the state constitution. But we see no basis to distinguish state and federal due process protections here. *Star-Kist* noted that the Fourteenth Amendment confers fundamental rights on *individual citizens.* "Political subdivisions cannot assert 'constitutional rights which are intended to limit governmental action vis-à-vis individual citizens' . . . ." (42 Cal.3d at p. 8.) The same reasoning applies to the due process protections afforded under

the California Constitution. (See also *Santa Monica Community College Dist.* v. *Public Employment Relations Bd.* (1980) 112 Cal.App.3d 684, 690 [169 Cal.Rptr. 460] [citing "the long line of cases which hold that a public entity, being a creature of the state, is not a 'person' within the meaning of the due process clause, and is not entitled to due process from the state."]; *County of Los Angeles* v. *Superior Court* (1933) 128 Cal.App. 522, 526 [18 P.2d 112] ["the county is not a 'person' within the meaning of either the federal or the state Constitution and is not protected by the due process clause of either."]; *Riley* v. *Stack* (1933) 128 Cal.App. 480, 484 [18 P.2d 110] [same]; cf. *State of California* v. *Marin Mun. W. Dist.* (1941) 17 Cal.2d 699, 705-706 [111 P.2d 651] [declining to pass on the issue but holding that legislation requiring a local water district to bear the expense of relocating a pipe line in a state highway when necessary to permit improvement of the highway or to insure safety of the traveling public is a valid exercise of the state's police power to protect the health and safety of its inhabitants].)

Moreover, as against the state, the County has no "property" interest in its revenues. "[*A*]*ll* property under the care and control of a county is merely held in trust by the county for the people of the entire state. The county is merely a political subdivision of state government, exercising only the powers of the state, granted by the state, created for the purpose of advancing 'the policy of the state at large, for purposes of political organization and civil administration, in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and transport, and expressly for the general administration of justice.' [Citations.] The county holds all its property, therefore, not just highway easements, as agent of the state. [Citations.] [¶] . . . [*A*]*s against the state,* the county has no ultimate interest in the property under its care." (*County of Marin* v. *Superior Court* (1960) 53 Cal.2d 633, 638-639 [2 Cal.Rptr. 758, 349 P.2d 526], italics in original; see also *Conlin* v. *Board of Supervisors* (1893) 99 Cal. 17, 21 [33 P. 753] [local moneys are public moneys acquired under the authority of the state for public purposes; Legislature thus may direct a local government to make any payment of its funds].)

Butte County may not challenge the state's statutory scheme for AFDC fundings on due process grounds. To the extent the preliminary injunction rests on this ground, we cannot uphold it.

II. CALIFORNIA CONSTITUTION ARTICLE XVI, SECTION 11, DOES NOT REQUIRE THE STATE TO FULLY FUND ALL MANDATED LOCAL PROGRAMS.

California Constitution article XVI, section 11, provides: "The Legislature has plenary power to provide for the administration of any

constitutional provisions or laws heretofore or hereafter enacted concerning the administration of relief, and to that end may modify, transfer, or enlarge the powers vested in any state agency or officer concerned with the administration of relief or laws appertaining thereto. The Legislature, or the people by initiative, shall have power to amend, alter, or repeal any law relating to the relief of hardship and destitution, whether such hardship and destitution results from unemployment or from other causes, or to provide for the administration of the relief of hardship and destitution, whether resulting from unemployment or from other causes, either directly by the State *or through the counties of the State, and to grant such aid to the counties therefor, or make such provision for reimbursement of the counties by the State, as the Legislature deems proper.*" (Italics added.)

■ Although article XVI, section 11, allows the legislature to aid or reimburse counties, it does not *require* such aid. A construction of the constitutional provision that found an aid requirement would eliminate the word "such" in relation to the aid or reimbursement contemplated. "Such . . . as" means "any or all . . . that" or "as many (or as much) . . . as." (6 Oxford English Dict., p. 86.) By this provision, article XVI, section 11, gives the Legislature discretion to aid or reimburse counties entirely, partially, or not at all, for state-mandated welfare costs.[4]

To the extent the preliminary injunction rests on article XVI, section 11 of the California Constitution, we cannot uphold it.

■ ■ ■ ■ We turn next to two additional theories raised here to support the trial court's conclusion that the County would likely prevail on the merits.[5] First, the County argues that its payments for state-mandated programs violate its home rule rights when such payments force it to curtail expenditures for local programs and services. Second, the County claims that its financial situation makes it impossible to comply with state law.

III. HOME RULE PRINCIPLES DO NOT PREVENT THE STATE FROM REQUIRING LOCAL CONTRIBUTIONS TO STATE-MANDATED PROGRAMS.

■ "The principle of home rule involves, essentially, the ability of local government (technically, chartered cities, counties, and cities and counties)

---

[4] Federal law limits a state's discretion to deny substantial reimbursement to counties for AFDC payments. "State funds [must] be used to pay a substantial part of the total costs of the assistance programs." (45 C.F.R., § 205.130 (b).)

[5] On appeal, we review the trial court's *decision,* not its reasoning. (See, e.g., 9 Witkin, Cal. Procedure (1985) Appeal, § 259, at p. 266.) We can affirm an erroneously based decision if the record supplies an alternative tenable legal ground. (*Id.* at §§ 259-261, pp. 266-269.)

to control and finance local affairs without undue interference by the Legislature. [Citations.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 224-225 [149 Cal.Rptr. 239, 583 P.2d 1281]; see *Younger* v. *Board of Supervisors* (1979) 93 Cal.App.3d 864, 869-870 [155 Cal.Rptr. 921].)

Home rule issues typically arise when the state legislates on matters of purely local concern. Thus, in *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1], a statute invalidated agreements giving cost of living wage increases to local public agency employees. The court held that the statute violated chartered cities' and counties' home rule rights to determine their employees' compensation. (Pp. 315-317.) In *Ector* v. *City of Torrance* (1973) 10 Cal.3d 129 [109 Cal.Rptr. 849, 514 P.2d 433], a statute prohibited charter cities from prescribing residency requirements for their employees. The court held that the statute violated the cities' home rule right to prescribe their employees' qualifications. (P. 132.)

■ State legislation on matters of statewide concern, however, does not implicate home rule rights. On these matters, local government remains subject to state law. (*Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 505 [247 Cal.Rptr. 362, 754 P.2d 708]; see Cal. Const. art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws.*" (Italics added)].) Public social services like AFDC are matters of statewide concern. (Welf. & Inst. Code § 10600; see *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 211-212, fn. 18 [211 Cal.Rptr. 398, 695 P.2d 695]; *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 908 [141 Cal.Rptr. 133, 569 P.2d 727].) Thus, the statutory scheme requiring Butte County to fund a portion of its AFDC grants does not implicate home rule rights.

Again, we cannot uphold the preliminary injunction on this ground.

## IV. THE RECORD DOES NOT DEMONSTRATE IMPOSSIBILITY OF PERFORMANCE.

■ Finally, the County claims that its financial straits leave it literally unable to comply with the state mandate. It asks us to invoke the equitable doctrine excusing performance where circumstances make such performance impossible.

■ The traditional equitable maxim, codified in our Civil Code, states: "The law never requires impossibilities." (Civ. Code, § 3531.) Impossibility

means not only strict impossibility but also impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved. (*Oosten* v. *Hay Haulers etc. Union* (1955) 45 Cal.2d 784, 788 [291 P.2d 17].) ▪▪ Consistent with this maxim, the law recognizes exceptions to statutory requirements for impossibility of performance. (*People* v. *Lake County* (1867) 33 Cal. 487, 492 [impossibility of performance makes mandatory statutory duty directory]; *County of San Diego* v. *Milotz* (1953) 119 Cal.App.2d Supp. 871, 883-884 [260 P.2d 282]; see 73 Am.Jur.2d, Statute, § 15, p. 278 ["[W]here strict compliance with the terms of a statute is impossible, compliance as near as can be has been permitted on the principle that the law does not require impossibilities."].)

▪▪ The last quotation demonstrates the difficulty in applying the impossibility doctrine to the case before us. The County does not argue here that the injunctive relief granted will allow it to comply *substantially* with the statutory mandates. The County does not seek mere relief from some onerous detail required by statute. Rather, the County asserts impossibility to excuse *entirely* its desired nonperformance.

To bolster its claim, the County relies on an encyclopedia passage: "it is very generally held that a public body will not be required to do an act when it is impossible through a want of funds and inability to raise them . . . ." (55 C.J.S., Mandamus, § 14, p. 39.) In addition, the County relies on *Sutro Heights Land Co.* v. *Merced Irr. Dist.* (1931) 211 Cal. 670 [296 P. 1088]. We shall distinguish *Sutro Heights* and conclude that the record before us does not demonstrate impossibility sufficient to justify a preliminary injunction against complete enforcement of the statutory scheme.

We focus first on the evidentiary basis for the County's impossibility claim. Despite the County's reliance on its administrative officer's "uncontradicted" evidence, Nichols's testimony demonstrates no *literal* impossibility of County funding for the AFDC program at the heart of this dispute. Nichols's revenue projections do not show that the County will *ever* be unable to make the AFDC payments at the heart of the dispute. Indeed, from the record before us, we can assume that County revenues will be sufficient to meet state-mandated *AFDC* payments for the foreseeable future.

Rather, the County's "impossibility" argument rests on the purported inadequacies of County revenues to pay for *both* state mandated programs, including AFDC, *and* local programs. According to the County, this inadequacy excuses it from funding state-mandated programs. We disagree.

To the extent that this dispute involves a conflict between statewide priorities and local priorities, the statewide priorities must prevail. As the

state's agents, counties must comply with statutes; relief from state mandates must come from the Legislature and not from the courts. (See *Ross* v. *Superior Court, supra,* 19 Cal.3d at pp. 908-909, fn. 6 [discussing AFDC program].) Indeed, in *Jensen* v. *McCullough* (1928) 94 Cal.App. 382, 394 [271 P. 568], the court stated: "In the absence of some limitation on the power of the legislature, there is no sound reason why the entire burden of the care and maintenance of [the indigent, the orphans and half-orphans, the blind, the insane, the feeble-minded, the juvenile delinquents, the criminal and other dependent persons] could not be placed upon the political subdivisions of the state. [Citation.] If, therefore, in the wisdom of the legislature a portion of this burden is ordered to be borne by the political subdivisions and a portion by the state as a whole, the legislature is acting within its power, and the question of the wisdom of the action is, of course, not one for the courts to determine."

Beyond the theoretical limitations upon a county's power to refuse to fund a state mandate, three separate reasons required denial of the preliminary injunction. First, we note the time frame involved in Nichols's testimony. He testified that, as of the time of the court's hearing below, the County had at least five years before projected increases in state-mandated program costs would halt local County programs completely. While the wheels of government turn slowly at times, Nichols's window gave the County and the Legislature some time to address the County's problems.[6]

Second, the record contains absolutely no evidence suggesting that the County has done anything to increase its own locally generated revenues. While Proposition 13 severely limited the County's ability to raise new taxes, it did not eliminate that ability entirely. For example, California Constitution article XIII A, section 4, allows imposition of "special taxes" by a county upon a two-thirds vote of the electorate.[7] While we recognize that getting two thirds of the electorate to agree to a new tax may prove difficult, we cannot say that it is impossible until it has been tried.[8]

---

[6] The State has asked us to take judicial notice of several statutes enacted after the court below issued its preliminary injunction. (Evid. Code § 451, subd. (a).) According to the State, these included trial court funding and other legislative grants to the counties. (See Stats. 1988, ch. 974; Stats. 1988, ch. 945; Stats. 1988, ch. 313; see also Stats. 1987, ch. 1286.) We decline the invitation. As noted above in this appeal, we review the grant of a preliminary injunction solely for abuse of discretion. The trial court below could not have abused its discretion for failing to consider legislative bailouts that had not yet occurred.

The court's failure to consider meaningfully the *possibility* of such bailouts, however, did contribute to its abuse of discretion.

[7] Article XIII A, section 4, states: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

[8] Similarly, the record contains no suggestion that the "Gann limit" contained in article XIII B, section 1, would prevent the County from spending any additional revenues raised by a special tax or other new local funding source.

Finally, while we appreciate the difficulties the County's elected representatives face in providing important local services, the level of service decision ultimately belongs with the county electorate. If sufficient Butte County voters feel that the sheriff, the libraries, the roads or other programs merit additional county revenues, then they will vote accordingly. Even if the entire County cannot agree on increased funding for local programs, residents of defined areas within the County may choose from an entire array of special districts to tailor governmental services to that area's needs. (See, e.g., Gov. Code, §§ 61000, 61600 [community services districts].) Our decision here does not doom local programs and services desired by sufficient numbers of County residents.

Despite the record's inadequacies, the County argues that *Sutro Heights Land Co.* v. *Merced Irr. Dist., supra,* 211 Cal. 670 compels us to affirm. In that case, a landowner within the district's boundaries sought to compel it to perform its statutory duty to drain the landowner's property. The court held that, under the circumstances presented, equity would prevent the mandate from issuing.

The court noted that if it ordered the district to drain plaintiff's land, then the district's other landowners would also seek such an order. "The evidence shows that the district is in no position to meet the cost of such extensive additions to its present drainage system. . . . To compel the district to immediately install the facilities and works necessary to drain all the land in the district requiring drainage would bring financial ruin upon the district and irreparable injury to the land owners in the district, including the plaintiffs. We do not believe that, under this state of facts, it was ever intended by those responsible for the enactment of the Drainage Act of 1907, that an irrigation district, situated as is the defendant in this action, should be compelled to work its own destruction by undertaking to provide drainage facilities for the district, the expense of which is beyond its financial ability to meet or pay for. In fact, before a writ of mandate will issue to compel a public corporation or agency to perform an act involving the expenditure of money, it must affirmatively appear that there are funds available for that purpose. [Citations.]" (211 Cal. at pp. 703-704; see also *Flora Crane Service, Inc.* v. *Ross* (1964) 61 Cal.2d 199, 209 [37 Cal.Rptr. 425, 390 P.2d 193] ["mandate does not lie to compel a public officer to authorize expenditures when the proper funds are lacking"].)

We distinguish *Sutro Heights.* That court noted that each such case "depend[s] upon the facts of that particular case." (211 Cal. at p. 700.) That case presented the reviewing court with an extensive record. (*Id.* at p. 705.) In light of that record, the Supreme Court concluded that "the defendant district recognizes the duty imposed upon it by the statute and *is*

*endeavoring to comply with the requirements of said statute.* While it has not succeeded in discharging this duty to its fullest extent, it has done all that could be reasonably required of it with the money available for that purpose, and which the resources of the district will permit. Under such a state of facts, the writ of mandate will not lie." (*Id.* at p. 704, italics added.) Here, however, as outlined above, the record lacks the extensive factual development sufficient to justify affirmative relief. The county simply has not demonstrated that it has exhausted its ability to raise new revenues or deliver services differently.[9]

In summary, we cannot conclude that, on the record before the trial court, the County demonstrated a reasonable probability of prevailing on its "impossibility" claim. ██ ██ ██ ██ No other grounds exist to support the trial court's conclusion that the County would likely prevail on the merits.[10] We thus conclude that the court abused its discretion in

---

[9] In contrast, in *Sutro Heights,* the district's entire assessed value was less than $23 million. (211 Cal. at p. 703.) The district was already indebted $16 million. (*Ibid.*) Costs of just *some* of the improvements needed by the landowners would be $6 million to $8 million. (*Ibid.*) Moreover, at that time, the district's "tax rate was one of the highest in the state." (*Ibid.*)

Despite these financial limitations, the court found that the district had a "consistent, effective and comprehensive plan for the drainage of the lands in the district, including those of the plaintiffs . . . ." (*Id.* at p. 702.) Since the district was already trying its hardest to meet its statutory duty, the court refused to order it to change its overall development strategy merely to suit one individual's immediate need.

[10] An injunction may not be granted "[t]o prevent the execution of a public statute by officers of the law for the public benefit." (Code Civ. Proc., § 526, 2d subd. 4.) Four exceptions apply: 1) the statute is unconstitutional facially; 2) the statute is applied unconstitutionally; 3) the statute does not cover the plaintiff's activities; 4) the public official's action exceeds his or her power. (6 Witkin, Cal. Procedure, *supra,* Provisional Remedies, § 272, pp. 234-235.) None of these exceptions applies and we see no basis on this record to engraft another.

On the record before us, several reasons make puzzling the dissent's reliance upon California Constitution article XIII B, section 6. First, none of the parties have argued the provision's import before this court. At the trial court's prompting, they did spend some time discussing it below. Nevertheless, the County expressly told the court below that its action "is not a claim for reimbursement under Article XIII B." While the County believed that "it probably has a valid claim [under article XIII B]," it sought in its lawsuit to shift its *entire* AFDC payment obligation to the state. At best, article XIII B, section 6, would only allow reimbursement of the portions of AFDC payments constituting a "new program" or "increased level of service." The County's failure to argue the section's import here waives any reliance on that provision to support the preliminary injunction.

Second, even if the County had argued the section here, the record's inadequacies would have made such reliance premature. As the County conceded below, "[t]he AFDC program substantially predates the passage of Article XIII B. Hence, it is not a new program." Given this concession to the obvious, the dissent's apparent contrary conclusion leaves us quite surprised. In our view, the increase in state mandated AFDC payments fits under article XIII B, section 6, *if at all,* as an "increased level of service."

On this record, however, we cannot determine whether the increase in payments corresponds to an "increased level of service" within the constitutional provision's meaning. The evidence submitted below conflicts over the portion of the increase attributable solely to

granting the preliminary injunction.[11] Accordingly, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion. Respondent is ordered to pay appellants' costs of appeal.

Puglia, P. J., concurred.

**EVANS, J.,** Concurring and Dissenting.—I concur in parts I, II, III, and the general factual summary set forth in the majority opinion. However, I respectfully disagree with the analysis of the facts and law in part IV in the context of the doctrine of impossibility of performance and will dissent from that part of the opinion.

"The law never requires impossibilities." (Civ. Code, § 3531.) Impossibility means not only strict impossibility but also impracticability because of extreme and unreasonable difficulty, expense, injury, or loss involved. (*Oosten* v. *Hay Haulers etc. Union* (1955) 45 Cal.2d 784, 788 [291 P.2d 17].) Consistent with this maxim, the law recognizes exceptions to statutory requirements for impossibility of performance. (*People* v. *Lake County* (1867) 33 Cal. 487, 492 [impossibility of performance renders mandatory statutory duty directory only]; *County of San Diego* v. *Milotz* (1953) 119 Cal.App.2d Supp. 871, 883-884 [260 P.2d 282]; see 73 Am.Jur.2d, Statutes, § 15, p. 278 ["[W]here strict compliance with the terms of a statute is impossible, compliance as near as can be has been permitted on the principle that the law does not require impossibilities."].) More to the point in this case, "it is very generally held that a public body will not be required to do an act when it is impossible through a want of funds and inability to raise them, . . ." (55 C.J.S., Mandamus, § 14, p. 39.)

Thus, in *Sutro Heights Land Co.* v. *Merced Irr. Dist.* (1931) 211 Cal. 670 [296 P. 1088], a landowner within the irrigation district's boundaries sought to compel the district to perform its statutory duty to furnish drainage to

---

inflation. Absent an ampler attempt to document the basis for the *payments'* increase, we are unable to determine whether *services* have actually "increased" over the relevant period. Until such time, we defer any ruling that inflation caused increases alone constitute an "increased level of service."

Even assuming that a more adequate record might reveal some "increased level of service" under the constitutional provision, the County has failed to exhaust its administrative remedies before the Commission on State Mandates. (See *County of Contra Costa* v. *State* (1986) 177 Cal.App.3d 62, 73-78 [222 Cal.Rptr. 750].) The record before us establishes no excuse for this failure. Finally, we note that article XIII B, section 6, does not require reimbursement for "Legislative mandates enacted prior to January 1, 1975 . . . ." Given the record's inadequacies, we need not determine whether this or any other provision of article XIII B, section 6, exempts the state from any arguable reimbursement obligation.

[11] Our decision here makes unnecessary any review of the trial court's companion conclusion that the balance of hardships favored the County. Similarly, we need not reach any separation-of-power issues. (*American Academy of Pediatrics* v. *Van de Kamp, supra,* 214 Cal.App.3d 831, 837-838.)

the landowner's property. The court held that, under the circumstances presented, equity would prevent the mandate from issuing. The court noted that if the plaintiff were entitled to a mandatory injunction requiring the district to drain its land, then all other landowners in the district would seek to enforce their rights as well. "The evidence shows that the district is in no position to meet the cost of such extensive additions to its present drainage system. . . . To compel the district to immediately install the facilities and works necessary to drain all the land in the district requiring drainage would bring financial ruin upon the district and irreparable injury to the land owners in the district, including the plaintiffs. We do not believe that, under this state of facts, it was ever intended by those responsible for the enactment of the Drainage Act of 1907, that an irrigation district, situated as is the defendant in this action, should be compelled to work its own destruction by undertaking to provide drainage facilities for the district, the expense of which is beyond its financial ability to meet or pay for. In fact, before a writ of mandate will issue to compel a public corporation or agency to perform an act involving the expenditure of money, it must affirmatively appear that there are funds available for that purpose." (*Id.*, at pp. 703-704; see also *Flora Crane Service, Inc.* v. *Ross* (1964) 61 Cal.2d 199, 209 [37 Cal.Rptr. 425 [390 P.2d 193] ["mandate does not lie to compel a public officer to authorize expenditures when the proper funds are lacking"].)

Admittedly, this is not an action for writ of mandate seeking to compel Butte County (County) to perform its statutory duty to fund a portion of aid to families with dependent children (AFDC) grants in that county. Nonetheless, the principle stated is an equitable one (*Sutro Heights, supra,* 211 Cal. at pp. 704-705), and injunctive relief is an equitable remedy (6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 240, p. 209). If, as a matter of equity, impossibility of performance would be a defense to a petition for writ of mandate by the state against the County, I see no reason the County may not make a preemptive strike by seeking to enjoin enforcement of the statute in the first instance.

In similar fashion, there is no principled reason why the County should not be permitted to enjoin enforcement of the statutory funding scheme for AFDC in that County for financial inability to comply when financial inability would be a defense to an action against the County's Board of Supervisors (Board) for contempt should it have refused to comply. Thus, in *Ross* v. *Superior Court* (1977) 19 Cal.3d 899 [141 Cal.Rptr. 133 [569 P.2d 727], the Board of Supervisors of Plumas County was found guilty of contempt for refusing to pay certain welfare benefits as ordered by the Department of Benefit Payments (now the Department of Social Services [Department]). The court affirmed the judgment, reasoning, in part, that the unchallenged evidence established beyond question that Plumas County

had the financial ability to comply with the order. (*Id.*, at p. 916.) Impossibility of performance is a defense to an action for contempt. (*Nutter v. Superior Court* (1960) 183 Cal.App.2d 72, 75 [6 Cal.Rptr. 404].)

I recognize that an injunction may not be granted "[t]o prevent the execution of a public statute by officers of the law for the public benefit." (Code Civ. Proc., § 526, 2d subd. 4.) The rule is subject to exception, however. Thus enforcement of a public statute may be enjoined when it is unconstitutional on its face or unconstitutionally applied, when it does not cover the plaintiff's activities, or when the public official's action exceeds his power. (6 Witkin, Cal. Procedure, Provisional Remedies, *supra,* § 272, pp. 234-235.) In light of the equitable nature of the remedy, I believe the exceptions to the rule stated should be extended to permit enjoining the execution of a public statute in a situation that factually would be contrary to established principles of equity.

I also acknowledge that, in the context of the state-mandated general assistance program (Welf. & Inst. Code, § 17000 et seq.), it has been consistently held that state law imposes upon local government "a mandatory duty to relieve and support its indigents, and the excuse that it cannot afford to do so is unavailing." (*City and County of San Francisco* v. *Superior Court* (1976) 57 Cal.App.3d 44, 47 [128 Cal.Rptr. 712]; *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 217 [211 Cal.Rptr. 398, 695 P.2d 695]; *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 680 [94 Cal.Rptr. 279, 483 P.2d 1231]; *Nelson* v. *Board of Supervisors* (1987) 190 Cal.App.3d 25, 32 [235 Cal.Rptr. 305]; *Clay* v. *Tryk* (1986) 177 Cal.App.3d 119, 125 [222 Cal.Rptr. 729]; *Boehm* v. *Superior Court* (1986) 178 Cal.App.3d 494, 503 [223 Cal.Rptr. 716]; *Boehm* v. *County of Merced* (1985) 163 Cal.App.3d 447, 451 [209 Cal.Rptr. 530]; *Rogers* v. *Detrich* (1976) 58 Cal.App.3d 90, 103 [128 Cal.Rptr. 261].) The rule is premised, however, on the fact that "the county retains extensive authority to establish standards for General Assistance, both as to eligibility and as to amount of aid. In view of this discretion, the county can surely find many ways which do not violate state statute in which it can limit General Assistance payments to the financial resources available." (*Mooney* v. *Pickett, supra,* at p. 680; see Welf. & Inst. Code, § 17001.) In contrast, under the AFDC program, the counties have no discretion as to eligibility and as to amount of aid. In that respect, the cited cases are distinguishable, and I would conclude the rule would not be applicable here. Moreover, the cited cases have not considered the rule in the context of the maxim that the law never requires impossibilities.

Finally, I acknowledge that, even in the context of AFDC, it has been held that counties, as agents of the state, are bound to comply with state statute and that relief from state mandates must come from the Legislature

and not from the courts. (See *Ross* v. *Superior Court, supra,* 19 Cal.3d at pp. 908-909 & fn. 6; see also *Jensen* v. *McCullough* (1928) 94 Cal.App. 382, 394 [271 P. 568] ["In the absence of some limitation on the power of the legislature, there is no sound reason why the entire burden of the care and maintenance of [the indigent, the orphans and half-orphans, the blind, the insane, the feeble-minded, the juvenile delinquents, the criminal and other dependent persons] could not be placed upon the political subdivisions of the state. (*Sacramento* v. *Chambers* [1917] 33 Cal. App. 142, 145 [164 Pac. 613].) If, therefore, in the wisdom of the legislature a portion of this burden is ordered to be borne by the political subdivisions and a portion by the state as a whole, the legislature is acting within its power, and the question of the wisdom of the action is, of course, not one for the courts to determine."].) However, the duty of a county to support the indigent presupposes the county's power and authority to raise the funds with which to do so. (See *San Francisco* v. *Collins* (1932) 216 Cal. 187, 190-191 [13 P.2d 912]; cf. *May* v. *Board of Directors* (1949) 34 Cal.2d 125, 131 [208 P.2d 661] [the power to tax is "the very essence" of municipal bond obligations].) Therein lies the problem I see. By article XIII A of the California Constitution (Prop. 13), the state has significantly limited the power of local government to raise revenues, creating over a period of time an impossible situation—local government has been rendered incapable of keeping pace with increasingly rising costs for state-mandated programs. I see no reason why, in the wake of Proposition 13, the duty of local government to comply with state mandates must remain so hard and inflexible. "When the reason for a rule ceases, so should the rule itself." (Civ. Code, § 3510.) Accordingly, when it can be shown that a local government's compliance with a state mandate is financially impossible of performance, a court of equity may intervene to provide relief.

With this in mind, I examine the County's likelihood of success on the merits at trial. The uncontroverted evidence adduced at the hearing below disclosed that Butte County is on the verge of bankruptcy because of state-mandated programs, in particular the AFDC program. County has the lowest tax base in the state, with the consequence that per capita general purpose revenues in the county are $139, compared to the statewide average of $268. State-mandated expenses are rising considerably faster than the County's revenues, with the result that essential local services must be curtailed. Butte County has "the worst level of [police] protection in any county in California." And by 1993, it is estimated that state-mandated expenses will consume the entire county budget. On these facts, I do not perceive an abuse of discretion in ruling that the County will likely succeed on the merits at trial.

For the same reason I believe the County is likely to succeed on the merits, the County would suffer more harm should the injunction not issue

than would the state should it issue. Indeed, the state made no showing in this respect. The only apparent consequence of issuance of the injunction is that the state will have to opt out of the AFDC program (a politically unlikely possibility) or that the state will have to pick up the County's 5.4 percent share of AFDC funding. The Department made no showing that this would be any hardship; its only argument against the injunction was that the Board had no legal theory on which it could issue.

I conclude that the issuance of the preliminary injunction in this case is supported by equitable principles established by decisional authority. The relief if granted, however, must be limited to enjoining the Department from requiring the County to contribute 5.4 percent increase of the cost for AFDC grants in the County. To extend the injunction to mandate the state to supply that 5.4 percent share would pose a severe separation of powers problem. The courts may not mandate the Legislature to appropriate money for specific purposes. (See *City of Sacramento* v. *California State Legislature* (1986) 187 Cal.App.3d 393 [231 Cal.Rptr. 686].)

Additionally, and I believe more importantly, I would affirm the issuance of the preliminary injunction against a requirement that County fund any increases in the AFDC program required after November 6, 1979, as a violation of the provisions of article XIII B, section 6. Article XIII B, section 6, was enacted on that date and provides, "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

It appears obvious to me that the state requirement that the County fund the increase in AFDC mandated by the state is a program within the meaning of article XIII B, section 6; under the constitutional restraints the state may not shift the burden of such program funding to the County.

The term "program" in the constitutional context has a dual meaning. One encompasses programs that carry out the government function of providing services to the public, in this instance AFDC. The second are laws that implement state-mandated policy and impose unique requirements on local governments and do not apply generally to all residents in the state. Either finding will trigger the reimbursement requirement. In this case, the

increase in funding of the AFDC program mandated by the state after 1979 met both requirements.

The application of article XIII B, section 6, does not relate to when the program was established but when the increased funding of the program was made an obligation of the County. I would conclude the obligation to fund any increases in AFDC programs after 1979 is one of the state rather than the County.

I would reverse the preliminary injunction to the extent it would require the state to fund Butte County's share of the County's AFDC program, but would affirm it to the extent it preliminarily forbids the state from requiring Butte County to increase its contribution to the AFDC program in that county and remand the matter for further appropriate proceedings in the trial court.

A petition for a rehearing was denied April 30, 1990, and the opinion was modified to read as printed above. Evans, J., was of the opinion that the petition should be granted. The petition of respondent Board of Supervisors of Butte County for review by the Supreme Court was denied June 27, 1990.